**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ruben MAGDANIEL–MORA, Henny De-kom, Ibrahim Nunez, Francisco Vi-cente-Leon and Felix Calvo-Castillo, Defendants-Appellants.**

No. 83–5008.

United States Court of Appeals,
Eleventh Circuit.

Nov. 12, 1984.

Rehearing and Rehearing En Banc
Denied Jan. 4, 1985.

Simpson, Senior Circuit Judge, concurred in part and dissented in part with statement.

Dennis G. Kainen, Asst. Federal Public Defender, Miami, Fla., for Magdaniel-Mora and Dekom.

Raymond J. Takiff, Coconut Grove, Fla., for Nunez.

Roberto Martinez, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Mark King Leban, Miami, Fla., for Vicente-Leon and Calvo-Castillo.

Before RONEY and VANCE, Circuit Judges, and SIMPSON, Senior Circuit Judge.

VANCE, Circuit Judge:

For most people, being stranded for several days aboard a disabled fishing boat in the Gulf of Mexico twenty miles northwest of Grand Cayman Island would constitute a misfortune of epic proportions.[1] The travails of appellants in this case, however, began in earnest only when a boarding party from the Coast Guard cutter DECISIVE retrieved them from their immobile vessel, the DON CARLOS—along with 12,-000 pounds of marijuana.

All five persons found aboard the DON CARLOS were convicted of possessing marijuana on board a United States flag vessel with intent to distribute, in violation of 21 U.S.C. § 955a(a), and of conspiracy to commit the substantive offense in violation of 21 U.S.C. § 955c. United States residents Felix Calvo-Castillo, Francisco Vicente-Leon, and Ibrahim Nunez present the only serious issues for our consideration on appeal.[2] We reject their contentions in sequence and therefore affirm the convictions of all appellants.

## I. SEVERANCE

Appellants Calvo-Castillo, Vicente-Leon, and Nunez (the severance appellants) protest the district court's denial of their motions for severance from appellants Magdaniel-Mora and Dekom, made once before and repeatedly during trial. They contend that severance should have been granted because Magdaniel-Mora and Dekom asserted a defense irreconcilable with and mutually exclusive of that argued by counsel for the severance appellants in closing argument.

To repeat the familiar, persons indicted together ordinarily should be tried together. United States v. Barnes, 681 F.2d 717, 721 (11th Cir.1982), cert. denied, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983). This court will only review a trial court's refusal to grant a severance under Fed.R.Crim.P. 14 for abuse of discretion. United States v. DeSimone, 660 F.2d 532, 539 (5th Cir. Unit B 1981), cert. denied, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). To establish an abuse of discretion the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection. United States v. Horton, 646 F.2d 181, 186 (5th Cir. Unit A), cert. denied, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981); United States v. Crawford, 581 F.2d 489, 491 (5th Cir.1978). This circuit recognizes that the assertion of antagonistic defenses may satisfy this test, but to do so the defenses must be irreconcilable and mutually exclusive. Crawford, 581 F.2d at 491. In other words, "the essence of one defendant's defense [must be] contradicted by a co-defendant's defense." United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir. Unit B 1981).

Applying these principles, we conclude that the trial court did not abuse its discretion in denying the motions for severance. The severance appellants' defense, which consisted solely of counsels' closing arguments,[3] was a claimed absence of evi-

1. Cf. Regina v. Dudley & Stephens, 14 Q.B.D. 273 (1884).

2. Colombians Ruben Magdaniel-Mora and Henny Dekom offer only one ground for reversal of their convictions. They laconically suggest that we disregard unequivocal, binding precedent and declare 21 U.S.C. § 955 unconstitutionally vague and overbroad. See United States v. Hensel, 711 F.2d 1000, 1002–03 (11th Cir.1983); United States v. Stuart-Caballero, 686 F.2d 890, 891 (11th Cir.1982), cert. denied, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983); United States v. Marino-Garcia, 679 F.2d 1373, 1383–84 (11th Cir.1982), cert. denied, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); United States

v. Julio-Diaz, 678 F.2d 1031, 1033–34 (11th Cir. 1982). We decline to do so.

3. In most of the circuit court cases throughout the country addressing the issue of severance in the context of antagonistic defenses, it is apparent that the appellant introduced evidence in support of his defense theory. In those cases in which the appellant or his co-defendant clearly did not introduce evidence, the courts have not required severance, on the ground that no sufficient inconsistency was shown with the co-defendant's defense. See United States v. Barnes, 681 F.2d 717, 722 (11th Cir.1982), cert. denied, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983); United States v. DeSimone, 660 F.2d 532,

dence sufficient to demonstrate to the jury beyond a reasonable doubt that appellants possessed the marijuana or that they knew of or participated in a conspiracy to possess the marijuana with intent to distribute. They argued that the government had shown only their presence aboard a vessel twenty miles off Grand Cayman Island, in other parts of which vessel marijuana was found to have been secreted.[4]

After the government rested, appellants Magdaniel-Mora and Dekom took the stand to testify in their own defense. They admitted that they knew of the DON CARLOS' contents before the marijuana was discovered by the Coast Guard. They testified, however, that they innocently boarded the boat at the behest of one El Chino Ramos off the Colombian coast, Magdaniel-Mora as a helmsman and Dekom as an electrician. According to them, the severance appellants were already aboard the DON CARLOS, and the five appellants sailed north for several days before losing power and drifting several more days until they were spotted and picked up by the Coast Guard. They testified that, upon discovering the ship's cargo, they asked to be returned to South America, but the severance appellants refused to do so. Both Magdaniel-Mora and Dekom asserted that the severance appellants pressured them until Magdaniel-Mora agreed to falsely identify himself to the Coast Guard as the DON CARLOS' captain, and that the true captain was Vicente-Leon.

We acknowledge that Magdaniel-Mora and Dekom, in pursuing their defense, introduced evidence damaging to the severance appellants. The severance appellants, however, must show more than that separate trials would have strengthened their chances for acquittal, *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), *cert. denied*, — U.S. —, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984); they must satisfy the court that "the essence of [their] defense is contradicted by a co-defendant's defense." *Berkowitz*, 662 F.2d at 1134. The severance appellants' defense was one simply of a lack of sufficient evidence upon which to convict. Although Magdaniel-Mora's and Dekom's testimony tended to implicate the severance appellants in a marijuana importation and distribution scheme, it did not require the jury, even if it believed all the testimony, to reject the severance appellants' argument of inadequate evidence. The jury was not logically compelled, upon accepting Magdaniel-Mora's and Dekom's testimony as true, to find that the severance appellants possessed the marijuana, knew of or participated in a conspiracy to possess the marijuana, or intended to distribute the marijuana.

This case thus is unlike *United States v. Crawford*, 581 F.2d 489 (5th Cir.1978), and *United States v. Johnson*, 478 F.2d 1129 (5th Cir.1973), the only two cases we have discovered in this or any other circuit in which an appellate court has reversed a

---

541 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982); *United States v. Dohm*, 597 F.2d 535, 539–40 (5th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 196 (1979); *United States v. Marable*, 574 F.2d 224, 231 (5th Cir.1978); *see also United States v. Merchant*, 693 F.2d 767, 769–70 (8th Cir.1982); *United States v. Woody*, 690 F.2d 678, 680 (8th Cir.1982), *cert. denied*, 459 U.S. 1177, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983); *United States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir.1980). In light of our disposition of the severance issue, we need not decide whether the failure to introduce evidence in support of an argued defense is fatal to a defendant's challenge to a denial of severance based on antagonistic defenses.

**4.** The severance appellants in brief claim as their defense that they "were mere crewmen or

passengers aboard the DON CARLOS, having boarded at Grand Cayman Island and traveled but a short distance prior to the failure of the engines; as such, they were unaware of the cargo." This defense was neither accompanied by any evidence or proffer of evidence in the trial court, nor mentioned in closing argument. At any rate, counsel in oral argument before this court plainly disavowed the defense:

> THE COURT: You're not going to prove that they didn't get on the boat [in South America] ... but you have a right to argue that they didn't get on the boat?
>
> COUNSEL: No sir, we have a right to argue that the government did not prove its case, and that's what we were presenting in the way of our defense—a lack of evidence ...

conviction for failure to grant a severance due to antagonistic defenses. In *Crawford* each defendant in a prosecution for illegal possession of an unregistered sawed-off shotgun denied ownership of the firearm and claimed that the other defendant owned it. As this court noted, "[t]he sole defense of each was the guilt of the other." 581 F.2d at 492. Logically, then, acceptance of one defense required rejection of the other.

In *Johnson* the appellant in a counterfeiting suit asserted the defense that he was not present when the crime was committed. His co-defendant admitted his own presence and testified that the appellant was there as well, apparently to bolster his defense that he was merely seeking to catch the appellant and a third person in a criminal act and that he thus lacked the requisite intent to defraud. 478 F.2d 1131–33. If the jury accepted the co-defendant's testimony that the appellant was at the scene of the crime, it necessarily had to reject the appellant's sole defense to the charges against him.

Here, in contrast, the severance appellants relied simply on the jury's capacity to find that the government had failed to prove its case, and the jury retained that capacity even if it accepted the testimony of Magdaniel-Mora and Dekom.[5] In short, "[t]he jury could have believed both [sets of] defendants' theories of defense." *United States v. Stephenson*, 708 F.2d 580, 582 (11th Cir.1983).

## II. SUFFICIENCY OF THE EVIDENCE

■ The severance appellants also join forces to contest the sufficiency of the

evidence against them on both the substantive and the conspiracy counts. Counsel for these appellants moved for a judgment of acquittal at the close of the government's case, and the trial court denied the motions.[6] As we have noted, the severance appellants introduced no evidence after the government rested. Consequently, our review of the sufficiency of the evidence is restricted to that adduced by the government in its case-in-chief. *United States v. Rhodes*, 631 F.2d 43, 44–45 (5th Cir. Unit B 1980); *United States v. Belt*, 574 F.2d 1234, 1236 (5th Cir.1978). Our inquiry is further limited by two additional rules of law: that the evidence and the inferences to be drawn from it must be viewed in the light most favorable to the government, and that the evidence need only be such that a reasonable jury could find appellants guilty beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 358, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Appellants insist that the government's evidence in this case, like that in *United States v. Willis*, 639 F.2d 1335 (5th Cir. Unit A 1981), establishes no more than their presence on a boat carrying contraband. We disagree. The government's proof, though not overwhelming, was adequate to survive appellants' motions for acquittal.

The government relied primarily on the testimony of boatswain's mate Eugene Garner, a member of the Coast Guard party that boarded the disabled DON CARLOS. At the time of the boarding, all five defendants were gathered near the stern while one worked to revive the vessel's

---

5. Magdaniel-Mora's and Dekom's testimony, if believed in its entirety, placed the severance appellants on the DON CARLOS off the Colombian coast a week before the Coast Guard's boarding, with Vicente-Leon as captain; showed them denying a request to return home with the response, "To go back, nothing. It would be better for us to die."; and depicted them convincing Magdaniel-Mora to present himself to the Coast Guard as captain "because he [Vicente-Leon] said nothing would happen to me because they would deport me right away." In part II of this opinion we examine the government's evidence in rejecting the severance appel-

lants' challenge to the sufficiency of the evidence. Without expressing an opinion on whether a co-defendant's self-exculpating evidence can ever logically exclude all reasonable doubt of a defendant's culpability, we conclude that Magdaniel-Mora's and Dekom's testimony, in conjunction with the government's evidence, did not compel such a result by the jury.

6. Appellants raise no complaint concerning the denial of their motions for acquittal made at the close of all the evidence.

engines. Garner proceeded toward the bow of the boat, entering the pilot house. Beyond it was a forward cabin, the entrance to which consisted of a gap in the waist-high wall at the front of the pilot house. As Garner entered the forward cabin he was met with a strong odor of marijuana. A picture taken from the pilot house was introduced, and Garner testified that it represented exactly what he saw as he approached and entered the forward cabin. Several burlap bales of what appellants concede was marijuana are clearly visible.[7]

The only two sleeping bunks on board were located in the pilot house within a few feet of the marijuana bales and in a direct line of vision. The bunks were located next to a hatch, underneath which Garner found more bales of marijuana. A thorough search of the DON CARLOS turned up 12,000 pounds of marijuana in 319 bales aboard the forty-seven foot vessel. Various travel bags filled with clothing were discovered in the pilot house. The galley was also located in the pilot house, to the right of the forward cabin entrance. It was well stocked with food, and chicken and noodles lay in saucepans on the stove. Finally, the pilot wheel itself stood in the pilot house, to the left of the forward cabin entrance.

A chart showing the Gulf of Mexico was found in the pilot house and introduced into evidence by the government. A series of black and green dots that Garner, who qualified as an expert on navigational markings, identified as a route or track line appeared on the chart. The dots extended from the southern border of the map west of Jamaica northwest past Grand Cayman Island. Five of the eight dots were clustered within a few square miles of the DON CARLOS' location when spotted by the Coast Guard.

The defendants when rescued were unshaven and wearing dirty, malodorous clothing. Although equipped as a refrigerated fishing vessel, the DON CARLOS' lobster pots were "old and a little rotten-like" and she carried no seafood or any other cargo except the marijuana.

■ Considering this evidence, appellants' reliance on *United States v. Alfrey,* 620 F.2d 551, 556 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), is misplaced.[8] The course plotted on the chart and certainly extending further south, appellants' personal appearance, and the disabled condition of the craft when discovered indicate appellants' presence on the DON CARLOS for a substantial period; the great quantity of marijuana on board and its easy detectability by sight and smell from the hub of activity that was the pilot house support appellants' awareness of the contraband; and the presence of five sailors, one of them presumably the captain, on the forty-seven foot vessel strongly suggests a close relationship between and among the defendants.

Applying the proper standard of review, we conclude that the government's evidence was sufficient to withstand appel-

---

7. Defense counsel on cross-examination suggested that the bales had been covered by a blanket, which another member of the boarding party removed before Garner entered the pilot house. Garner, however, testified that he was unaware of any such alteration of the forward cabin's appearance.

8. Under *Alfrey,* "the probable length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between the captain and his crew [are] factors from which the jury [may] reasonably find guilt [of conspiracy to import or distribute marijuana] beyond a reasonable doubt." *United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir.1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). The existence of these three factors is alone adequate to create a prima facie case. *United States v. Freeman,* 660 F.2d 1030, 1035 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); *United States v. Mazyak,* 650 F.2d 788, 790–91 & n. 2 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982).

Appellants offer no argument with respect to the substantive counts beyond those advanced in opposition to their conspiracy convictions. We note in passing, however, that the circumstantial evidence of their possession of the contraband is comparable to that deemed sufficient in *United States v. Bustos-Guzman,* 685 F.2d 1278, 1280–81 (11th Cir.1982).

lants' midtrial motions for acquittal. *See* *United States v. Ceballos,* 706 F.2d 1198, 1201–02 (11th Cir.1983); *United States v. Bustos-Guzman,* 685 F.2d 1278, 1280–81 (11th Cir.1982); *United States v. Riker,* 670 F.2d 987, 988–89 (11th Cir.1982).

### III. COMMENT ON SILENCE

Calvo-Castillo and Vicente-Leon raise one final contention: that the government violated their right to due process and their privilege against self-incrimination by eliciting from Garner evidence of their silence in the face of questions posed by Garner. Garner testified that, upon discovering the bales in the forward cabin, he walked to the stern of the DON CARLOS, where the five defendants were gathered, and inquired about the bales' contents. After performing a field test that indicated the bales held marijuana, he returned and asked the defendants if they were aware of their cargo. Appellants find the following two pieces of testimony objectionable:

> GARNER: ... I went back to the after section of the ship where everyone was standing at and I said "What's in the bales?" and no one said anything....
>
> ....
>
> GARNER: I went back to the after section of the vessel and I explained to, I said "Do you realize it's marijuana that you have? Marijuana on board a U.S. flag vessel is against the law." And the gentleman that gave me the papers said, he looked at me—
>
> MR. DRESNICK: Objection, Your Honor.

■ The lack of merit in appellants' challenge to Garner's second statement is apparent. Defense counsel's objection cut off Garner before he could relate the response, if any, of appellants. Clearly, then, no comment on appellants' silence occurred. *United States v. Serrano,* 607 F.2d 1145,

1151 (5th Cir.1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980). Nor was the question posed by Garner so suggestive in itself as to constitute such a comment. *Id.; Pineda v. Florida,* 564 F.2d 1163, 1164–65 (5th Cir.1977), *cert. denied,* 436 U.S. 909, 98 S.Ct. 2245, 56 L.Ed.2d 409 (1978).

■ The first statement is more problematical.[9] We believe it will be helpful to begin our discussion by describing in some detail the characteristics of the comment on appellants' silence. First, the comment came in as direct evidence in the course of the government's case-in-chief, not as impeachment during cross-examination, or on rebuttal, after appellants took the stand. Second, the comment was made by a government witness, not by the prosecutor, directly or indirectly, during questioning or in closing.[10] Third, the comment exposed appellants' failure to speak at some time prior to trial, not their failure to testify at trial. Fourth, the comment related to appellants' failure to respond to an inquiry directed to them by a government official, not their failure to offer a statement, denial or explanation unprompted by a direct question.

We find *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) to be the Supreme Court's most instructive case on the use of pre-trial silence. Jenkins was tried for first degree murder. He testified at trial that he had acted in self-defense and described in some detail the circumstances of the fatal incident. On cross-examination and in closing argument the prosecutor brought out Jenkins' failure to seek out the police and volunteer to them this version of the facts. After his conviction Jenkins sought a writ of habeas corpus, alleging that the prosecutor's im-

---

9. Appellants voiced no objection to the introduction of this testimony. In consequence, they must establish before this court that its introduction amounted to plain error. *United States v. Aguiar,* 610 F.2d 1296, 1303 (5th Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980).

10. The government did not refer to Garner's testimony concerning appellants' silence during cross-examination of Magdaniel-Mora and Dekom, rebuttal, or closing.

peachment violated Jenkins' rights to due process and to remain silent.

In rejecting Jenkins' arguments, the court analyzed the two constitutional claims separately. The Court declared no fundamental unfairness existed because "no governmental action induced [Jenkins] to remain silent before arrest." 447 U.S. at 240, 100 S.Ct. at 2130. Thus, unlike the petitioner in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in which the Court prohibited the use of post—*Miranda* warning silence for impeachment purposes, Jenkins was not lulled into a false sense of security that his silence would not be used against him. 447 U.S. at 239–40, 100 S.Ct. at 2129–30. Jenkins' privilege against self-incrimination was not violated because upon taking the stand he was required, like all other witnesses, to testify truthfully. Impeachment with prior silence legitimately probes a testifying defendant's credibility and furthers the courts' truth-seeking function. The possibility of impeachment with prior silence is simply a factor in determining trial strategy. *Id.* at 236–38, 100 S.Ct. at 2128–29.

Under the guidance of *Doyle, Jenkins,* and *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), we reject appellants' due process claim. *Weir* refined *Doyle* by making plain that arrest alone is not sufficient to implicate due process considerations; only the giving of a *Miranda* warning or an equivalent affirmative assurance raises a fundamental fairness issue. 455 U.S. at 606–07, 102 S.Ct. at 1311–12. Since appellants had received no *Miranda* warnings, their insistence that Garner's questioning took place pursuant to a custodial detention misses the point.

At any rate, appellants were not in custody for purposes of *Miranda.* The Coast Guard's routine stop, boarding and inspection of an American flag vessel on the high seas does not rise to the level of a custodial detention. *United States v. Gray*, 659 F.2d 1296, 1301 (5th Cir. Unit B 1981); *United States v. Warren*, 578 F.2d 1058, 1070 (5th Cir.1978) (en banc), *modified,* 612 F.2d 887 (5th Cir.) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). In this case, Garner responded affirmatively to defense counsel's question, "You boarded it [the DON CARLOS] because you thought that they had a broken engine and you wanted to help them check for safety?"

In determining whether an initially routine boarding and safety inspection has metamorphosed into a custodial detention at the time of questioning, this court weighs four factors: (1) whether probable cause to arrest the defendant had arisen; (2) whether the interrogating officer subjectively intended a detention beyond that needed for a routine stop and search; (3) whether the defendant subjectively believed that his freedom was restricted so beyond the customary that he was imminently subject to arrest; and (4) whether the investigation had become accusatory and focused on the defendant. *Warren,* 578 F.2d at 1071–72. Taken together, the factors tip the balance here strongly against the existence of a custodial detention at the time Garner asked, "What's in the bales?" First, although probable cause to search the vessel may have existed once Garner discovered the burlap sacks, probable cause to arrest the defendants did not yet exist because the investigation into the bales' true contents was still under way. *United States v. Jonas*, 639 F.2d 200, 204 (5th Cir. Unit B 1981). In fact, none of the bales was opened for visual or tactile inspection until after Garner's inquiry. Second, the record does not disclose that Garner's subjective intent was to restrict the defendants' freedom beyond that incident to a routine boarding. Even after the ship's cargo had been identified as marijuana, Garner reported to the DECISIVE's captain for instructions, and was told to transfer the defendants to the cutter. Third, appellants' only reference to their subjective belief is their statement in brief that "[f]rom the moment the Coast Guard boarding party boarded the DON CARLOS, the defendants were under armed guard at the rear of the vessel where they were directed by [o]fficer Garner." This bald

assertion, however, finds no support in the record. At any rate, counsel for Dekom elicited Garner's affirmative response to the question, "I take it it's common practice for boarding parties when boarding boats, vessels in need of assistance to go armed, is that right?" *See also Warren*, 578 F.2d at 1070 (Coast Guard party armed when boarding for routine inspection). Although this fact is not determinative of appellants' belief, "[t]o the extent that the boarding and inspection are routine, the defendants should not feel coerced." *Id.* at 1071–72. Fourth, the accusatory stage had not yet commenced because the contents of the bales were unidentified, and thus Garner's party was still attempting to ascertain whether a crime had been committed. *Jonas*, 639 F.2d at 204–05.[11]

The only substantial distinction between this case and the *Doyle* line of cases is that in each case but this one the comment was elicited from the defendant on cross-examination and was used to impeach the defendant's exculpatory story told on direct examination. Appellants here never took the stand at all, and the comment came in as substantive evidence during the government's presentation. In a recent comment on silence case addressing both self-incrimination and due process challenges, this court concluded that "no persuasive justification" for reversal was presented simply by virtue of the fact that the comment on silence occurred during the government's case-in-chief. *United States v. Nabors*, 707 F.2d 1294, 1299–1300 (11th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1271, 79 L.Ed.2d 677 (1984).[12] Appellants' due process challenge therefore must fail.

■ Turning to appellants' second constitutional challenge to Garner's testimony, we note that the privilege against self-incrimination guaranteed by the fifth amendment is fulfilled through the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Absent the inherently coercive atmosphere of a custodial interrogation that requires the giving of *Miranda* warnings, however, a defendant's silence ordinarily must be accompanied by a claim of constitutional privilege. *Roberts v. United States*, 445 U.S. 552, 559–61, 100 S.Ct. 1358, 1363–65, 63 L.Ed.2d 622 (1980). As we have shown, appellants' silence did not occur during a custodial interrogation. Appellants nonetheless did not refer to the privilege then or later, including the sidebar conference following counsel's objection to Garner's second statement. This case thus is controlled by *Nabors*, 707 F.2d at 1299, in which this court held that evidence of a defendant's failure to respond to an insurance company's request for information about his involvement with the use of and damage to an insured airplane could be introduced by the government in a criminal prosecution because the defendant did not assert his privilege at the time he was silent.[13]

---

**11.** Appellants posit that references to even pre-arrest questioning can give rise to a due process violation, notwithstanding *Doyle* and its progeny. They rely for this rather startling conclusion on *United States v. Shavers*, 615 F.2d 266 (5th Cir.1980); *United States v. Serrano*, 607 F.2d 1145 (5th Cir.1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); and *United States v. Henderson*, 565 F.2d 900 (5th Cir.1978). *Henderson*, however, specifically addressed a right to silence challenge, 565 F.2d at 901, and *Shavers* did not pinpoint the constitutional guarantee at issue, 615 F.2d at 268–70. To the extent that *Serrano*, which did consider a due process argument, 607 F.2d at 1151, supports appellants' thesis, it has not been followed. In *Lebowitz v. Wainwright*, 670 F.2d 974 (11th Cir.1982), the eleventh circuit took great pains to chart the time line of *Doyle, Jenkins,* and several lower court cases and to peg the case before it along that line. Although the petitioner's silence occurred prior to arrest, *id.* at 975, and thus was not violative of due process under the *Doyle* line of cases, the court did not pursue an alternate analysis along the lines suggested by appellants. The court ignored the alleged import of the cases relied on by appellants here even as it cited *Shavers* in support of its harmless error discussion. *Id.* at 980 n. 13.

**12.** Like the defendant in *Nabors*, 707 F.2d at 1298, appellants do not contend that their silence in the face of Garner's questioning was not relevant under Fed.R.Evid. 401.

**13.** Like the Supreme Court in *Jenkins*, 447 U.S. at 236 n. 2, 100 S.Ct. at 2128 n. 2, we need not address whether the privilege against self-incrimination in fact extends to a pre-arrest situation such as this one.

## IV. CONCLUSION

Despite appellants' best efforts at reversal, we conclude that their appeal lies as dead in the water as the DON CARLOS.

AFFIRMED.

SIMPSON, Senior Circuit Judge, concurring in part, and dissenting in part:

I concur with the majority opinion in all respects save one: I cannot agree with Section I. Severance, and respectfully dissent from that portion of the opinion. I would reverse the convictions of appellants Calvo-Castillo, Vicente-Leon and Nunez on the ground that the trial judge abused his discretion by repeated denials of these defendants' Motions for Severance. To my mind, *U.S. v. Johnson*, 478 F.2d 1129 (5th Cir.1973) mandates this result.